Case No. 14-7030, Banneker Ventures, LLC, Appellant v. Jim Graham, et al. Mr. Grannis for the Appellant, Mr. Brickman for Appellee Ramada, and Mr. Golden for Appellee Jim Graham. Good morning. Good morning. May it please the Court, Your Honor, I'm Mark Grannis from Harris-Wiltshire. I'm here on behalf of Banneker Ventures appealing the dismissal of our complaint against Ramada, Jim Graham, LaCritz-Adler development and the principles of LaCritz-Adler. This was a case, I think, in which the sheer volume of the plaintiff's detailed allegations may have induced everyone to get a little bit ahead of themselves and ahead of the Rule 12 analysis. The District Court, in our view, engaged in a lot of weighing and sifting of the factual allegations that is not permissible under Rule 12 and which can't stand as the grounds for dismissal of a complaint at this early stage. I'd like to begin, if I may, with our contract claims because the District Court's analysis of those claims really drives a lot of the later analysis in the case. Our claims against Ramada were based on the 2008 term sheet that was finalized by the parties under which we paid $100,000 for an exclusive right to negotiate a definitive agreement later that would honor all the major terms in that term sheet. That contract, like all contracts in the District of Columbia, contained a duty of good faith and fair dealing, and so there were two distinct obligations created by that valid and binding contract. One was the obligation to negotiate exclusively with Banneker Ventures. The other was the obligation to negotiate in good faith with Banneker Ventures. And we alleged a failure to negotiate in good faith on Ramada's part by insisting on new terms that were not in the term sheet, by delaying formal approvals after all the material terms, in fact, all the terms had been agreed with the staff, by refusing to finalize after essentially refusing to take yes for an answer when all the terms were settled, and by, in general, evading the spirit of the agreement to agree that was embodied in the term sheet. And what about the exclusivity argument? I don't see a direct allegation that Ramada negotiated with others, but are you arguing that one can infer that from the leak of information to Lucretz Adler or the discussions about whether one could solicit, what are they, best and final offers from others? What are the paragraphs of the complaint that you would point us to that support an inference that they violated an exclusivity provision? Well, there's a direct allegation in paragraph 208. It's the sort of allegation you find in the Statement of Elements. It's that they failed to honor the exclusivity. So that's, if you're looking for more factual background, though, paragraph 6 of the complaint alleges that there were dozens of meetings that involved Jim Graham, Banneker Ventures, both the principals of Lucretz Adler and Rosalyn Docket of Ramada. Paragraph 6 states that those meetings occurred both outside and inside the period of exclusivity. In addition, paragraphs 260 to 262 tell the story of Lucretz Adler calling up Metro, saying that they're supposed to reach a deal, then Jim Graham leaking confidential details of Banneker's bid outside the process, sending it to Lucretz Adler, and then Lucretz Adler following up and calling Ramada with that information. To have this good-faith duty breached, do you need to allege that it was Ramada itself or its contracting officials that were not engaging in good faith, or is there authority that would suggest that a board member's single, sort of solo actions can itself cause Ramada contractors not to be acting in good faith? That's an interesting question that I think goes for after the Rule 12 states. In other words, our authority that we rely on is the Stanford Hotels case. Stanford Hotels makes it clear that, well, Stanford Hotels is very parallel in the facts. It makes it clear that you can't press the other side to agree to everything, get the signed contract after you've got this good-faith obligation to get to a signed contract, and then say no. The question is who was doing the pressing interfering here. Yes, so what was Jim Graham's status here? He was the chairman of the Metro Board. Maybe Metro wants to take the position that that isn't sufficient to close his acts in official authority. My guess is that counsel for WMATA and counsel for Jim Graham may have very different answers on that question, and the answers to that question may determine whether we prevail on our contract claims or our interference claims. It gets a little confusing to say that Jim Graham was WMATA for purposes of the activities he took, allegedly interfering with your reasonable expectations, but wasn't WMATA for purposes of immunity analysis. And so how does that get threaded? And that seems more almost a question of whether a legal claim has been stated in a way that would navigate the immunity question while still making him the one responsible for the interference. At this stage, Your Honor, we have pleaded both theories, as is our right. And the factual development that occurs after the pleading stage, after we get an answer, we don't even have an answer from Jim Graham or WMATA about what they think he was doing. But the very notion of a person having official status and acting in an official capacity part of the time and acting in a personal capacity other parts of the time is sort of metaphysical and sort of confusing, and I'm not sure that it's fair to hold plaintiffs to the standard of clearing that all up in a short and plain statement of the case. I think what we've heard is that WMATA breached the obligation of exclusive negotiation. WMATA breached the obligation of fair dealing. Jim Graham was certainly part of that because some of his actions were certainly official, but there were other actions of Jim Graham that we've detailed in the complaint that were outside of his responsibilities. And whether – and WMATA may be responsible for those unresponding at Superior, that's a separate question. WMATA may deny that, but that's all something that the defendants have to sort out after they answer our complaint. Well, Mr. Grannis, we do have to look and see whether you've crossed a threshold factually, and we assume the facts that can be reasonably inferred from your complaint under Twombly-Nickball, and then we apply the law. So some of these are hard legal issues we do have to resolve. And you pointed on the duty to negotiate exclusively. You pointed to some allegations that the Lakritz firm wanted in to the business that Banneker had negotiated, which I don't think is quite the same as saying WMATA failed to negotiate exclusively. So what I'm looking for is, I mean, clearly the outside developer wants in and, in fact, wants a piece of the existing, you know, the contract that seems to be being under negotiation with Banneker. But what about the idea of WMATA actually participating in that or responding to that? You point to allegations of Graham wanting to make a deal with Banneker, whereby Lakritz Adler would join the Banneker development team, which doesn't seem quite the same as violating an exclusive negotiation clause. Well, our allegation and the other citations I didn't mention before were paragraphs 70 and 71 and paragraphs 131 and 133. In all of these cases, we have Jim Graham carrying on a lively back-channel conversation with Lakritz Adler and the Lakritz Adler defendants. And so the argument that Lakritz Adler was making was, well, sure, we negotiated with them maybe, but they didn't. I'm sorry, WMATA was making the argument. Lakritz Adler may have negotiated with us, but we didn't negotiate back. We have pointed to specific facts that show that the chairman of WMATA's board was carrying facts back to Lakritz Adler and talking about the deal, which then the Lakritz Adler defendants were using to come back and approach the WMATA staff. And I believe that at least for Rule 12 purposes, that is surely sufficient to place an issue, whether WMATA was acting through Jim Graham or whether Jim Graham was freelancing. I'd love to hear their answer to that question. And are you relying on, I guess, paragraph 155, WMATA staff member telling Banneker that the staff member had been directed to obtain best and final offers from other firms other than Banneker, and this is during the time that this term sheet is in effect and they're supposed to be negotiating exclusively. Is that something you're relying on or not so much? We do rely on that. It is one of the facts that shows that we think what was actually going on here the whole time. And paragraph 160 is, I think, very much the same effect. Can you address both the immunity and sovereign immunity questions in this case? And in particular, how can you allege, on the one hand, that Mr. Graham was acting in ways that bound Metro through responding at Superior, therefore within the scope of his duties, but then for purposes of his own immunity analysis was outside the scope of his duties? Sure, Your Honor. We agree with the district court that the standards we've pointed to at Metro were standards of how not to act. We agree on that much. The dichotomy in the cases is between ministerial actions and discretionary actions. And the defendants here persuaded Judge Collier to essentially analyze this case as anything not ministerial must be discretionary. We think that this Court's cases actually start at the other end of the dichotomy. We start looking at what is discretionary because we only protect actual discretion. So we allege that Jim Graham was taking actions that were, in fact, expressly forbidden to him. He was telling staff to stop negotiating with Banneker. That's expressly forbidden. That's in paragraph 258. He was telling staff to cut Lekritz Adler into the deal. That shows favoritism toward one of the bidders. It's a violation of his impartiality. It's paragraph 259. He was leaking confidential information to rival bidders, paragraphs 134 and 261. And there are other actions that are not expressly prohibited, but which I think at least raise a question of fact as to whether they are manifestly excessive under this Court's decision in Briggs. Let's take the leaking information or violating his rules of impartiality. That just seems to be a way of saying he did his job very, very badly and very wrongly, which is usually the heartland of any immunity defense, right, that he was supposed to be making decisions and he did it partially rather than impartially. He was supposed to treat information in his hands confidentially, and he didn't. If that were a basis for denying immunity, how would we distinguish every other case where it's always an allegation that someone did their job very, very badly and wrongly? Under this Court's previous decisions, many of them involving WMATA, that's turned on whether or not there is some express prescription of how the employee should behave. So, for example, in the Souder case, we have Metro doing something entirely discretionary. It turns out they did have guidelines and they did follow them. No liability. In the Kiska case, we have Metro doing something without any guidelines, and without any guidelines, it was discretionary, and again, there's no liability. We have a case that's in the middle. There are guidelines, and they were violated. And because they were violated, there is no immunity. The question is not whether Jim Graham's actions can be characterized in everyday English as ministerial. The question is whether we can actually say that he was invested by Metro with discretion to leak confidential information when he saw fit. Was he invested by Metro with discretion to direct the staff that was expressly prohibited to him? It can't be a discretionary act if it's expressly prohibited. So he's prohibited by F2, Article 3, F2, of leaking confidential information. What prohibits him from working with the staff to get the best possible team on board and to add people that he thinks in his judgment would enhance the team? I think that there would be nothing that would prohibit him from working to get the best possible people on board. So what is it that prevents him from interfering with Banneker's development team and trying to get lacrets on board or getting Banneker to buy land from lacrets? Those are part of your case there, and what are the clear MATA guidelines? Well, some of the allegations of the complaint, of course, predate even Banneker's selection. So some of Jim Graham's actions also predate Banneker's selection. For example, the bullying of the development partners to try and get them to withdraw. Jim Graham was not the chairman of Metro at that point, and while you can't interfere with a contract that hasn't been signed yet, you certainly can interfere with the business expectancy. And so, again, these are… That's a very high bar to try to find interference with business expectancy. It's more than a mere wish. You have to have some reasonable belief that it's going to happen. It's a rather strong standard. Yes, Your Honor, and that would change with the facts. Before that could possibly have been the case. I'm not sure, Your Honor. I think that there's a long period of time that we're talking about, and so we have to examine each act in relation to what the expectancy was at that time. I thought you were alleging that when the term sheet was in effect, that WMATA, Graham interfered with the Banneker development team and pressured Banneker to buy land from his buddies. So I guess I'm wondering, what are the clear prohibitions on that? Well, because Jim Graham was pressuring in order to get one of his campaign supporters onto the team, that's different than just trying to work and get the best people. That would be a clear prohibition, a clear violation of the conflict of interest rules and using this for essentially his own electoral purposes. That's the allegation of the complaint. I see my time has expired. We'll keep going. You can't say that immunity turns on the spin the complaint gives factual allegations about how someone did their job, because then there would just never be immunity. And so your complaint spins it as he was doing this to advance his own electoral interests or parochial interests in his jurisdiction, and I assume he would say, no, I was doing exactly what I was supposed to do, protecting interests, looking broadly at the interests of Metro. And regardless, there is nothing that said beyond a very broad level of generality how exactly I should go about my job as a board member or a chair of the board. Your Honor, we don't know yet what Jim Graham will say because the district court, the whole point of immunity is to decide them before. Immunity is traditionally decided. The whole point of it is to decide before we go out to do answers and discovery, and so it can't be that we wait for them to file an answer and say, no, I have a different spin on those same facts. I think we look at the category of activity, and we say the category of activity here was being involved in decisions about contracting by Metro. And at that level, when it's within the realm, that's why they're responding as superior, and he just, in your allegation, did it very badly, very wrongly, which is the case in every situation where immunity is applied. I'm having trouble figuring out why you're different. But the burden is supposed to be on Mr. Graham to explain why he is entitled to official immunity, and that was a burden of which the district court relieved him here. I'm not sure how you can say she relieved him of that. She sits forth in that second opinion below. I know it's not quite in the same context, but it is the question of whether an act is discretionary in the context of immunity. There's four factors from Moss on the D.C. court, the nature of the injury, availability of alternative remedies, ability of the court to judge fault without unduly invading the executive's functions, and the importance of protecting particular kinds of acts. That seems to be what she applied. How is that relieving him of a burden? Mr. Graham himself was not required to put forth any evidence about the scope of his duties or about what he did. This is the immunity phase. And as the presiding judge suggests, normally at the immunity phase, the absolute immunity at least, you have not had discovery yet. It's a question of whether the party can be held in litigation or whether they're immune from it. The fact that we don't have discovery yet is not extraordinary. No, it's not just that we haven't had discovery. It's that we don't have any affirmation from Mr. Graham. But that's not needed if the face of the complaint itself reveals the basis for immunity, and so your complaint alleges in terms that Graham was acting within the course and scope of his employment. So does that mean the complaint itself has already provided the basis for immunity? That's what I was trying to ask you before. There's a distinction between responding on superior liability and the immunity question. And, again, this is one of those difficult areas where the same phrase gets used in different ways in different parts of the law. But it is well settled, and we've covered this in our brief, that an agency, an employer, anyone in a modest situation can be held under respondeat superior theory for something that was absolutely forbidden to the employer. So respondeat superior liability for Mr. Graham's actions is a different question from whether Mr. Graham's actions were truly discretionary within the scope of his employment. And the immunity question turns on his discretion. What cases said it's in the scope of employment for purposes of respondeat superior, but outside the scope of employment for immunity purposes? I believe Griggs says that, Your Honor. Because I thought what they did was they would say things were within the scope, but just manifestly excessive in the physical assault cases or the criminal allegation cases. They actually agreed that it was within the scope of employment, but just manifestly excessive in a way that we won't extend immunity. Do you think Griggs said? I had understood that to just identify a category of conduct that would be within respondeat superior, but outside the scope of the employee because it was manifestly excessive. Okay. So I think it's just we're having a different phrase, and I just think it's outside the scope of immunity. But would this qualify as manifestly excessive under any case? I think some of the conduct alleged here would qualify as manifestly excessive, Your Honor. I think the leaking of confidential bid information is extremely serious. And some of the, you know, there's a lot of suggestion in the factual record of actual quid pro quos. Now, that's not something that, you know, that's something that's been investigated. I know it's been, I know it's controverted because the conflict and the evidence on that is all over the footnotes of the investigative report that WMATIC commissioned on that. But we believe that presents a question of fact. Well, what I'm trying to figure out is if some of the things might qualify as manifestly excessive and others might not, the things Judge Pillard was mentioning. How are we supposed to sort of march through this? I mean, is the right course to remand and have the district court apply the analysis? Or is it for us to march through this and figure out what's manifestly excessive and what's not? Because I didn't sort of get that detailed level of analysis from the briefing, and there's a lot of different allegations here of conduct, and their timing is different. Yes. I certainly think that the factual record could benefit from more development before the district court. What we have relied on on appeal is the personal direction of the staff, telling staff to cut a rival bidder who's already lost the bidding process into the deal and then leaking the confidential information to the rival bidder to bring them around. Those are the main things that occurred during the negotiation period. Some of the other things that are mentioned in the complaint about the quid pro quo and the lottery contract and things like that may be relevant to other causes of action and I think should also be thought of in immunity terms. I hate to prolong this, but I'm going to do it anyway by jumping to something else. You use the term bid rigging a number of times. I don't see anything that looks like what I understand bid rigging to be. My understanding of bid rigging in the days when I was defending bid riggers was that it involved competitors getting together to fix a bid. I don't see any conduct here that fits any traditional definition of bid rigging. Can you enlighten me on that? Your Honor, I'm not an authority on bid rigging and we're not. There was a time in life when I was. I don't see anything here in these allegations that even resembles bid rigging. It looks like the competitors remain competitors. Are you seriously contending there's bid rigging here? I don't believe we're pressing any claims about bid rigging on the deal, Your Honor. Thank you. Thank you. Good morning. May it please the Court. My name is Doug Bregman. I represent the appellee, Wimata, and I will focus on counts 1, 2, and 7. And also, we've split the argument. Dan Golden represents the appellee, Jim Graham, and he will address the remaining counts on appeal. Judge Collier's decision to dismiss the counts in the amended complaint, which was close to 100 pages long, lodged against Wimata, should be affirmed. Taking first count 1, and Your Honor has asked questions about count 1 and where in the complaint is there an allegation that the term sheet obligation of exclusive negotiation, where was that violated by Wimata? I've scoured the amended complaint. It's difficult. It's a long document. There's a lot in there. The term sheet gave one right to Banneker, and that is it had an exclusive right to negotiate with Wimata for five months. That was extended. It didn't have to be, but it was extended by Wimata three times to the point where they really had 20 months. Is that a contractual right? To extend it? No, the contractual right to have that exclusive negotiation period with Wimata. Is that a contractual right? That was a contractual right. We're prepared to say, because the document, the term sheet itself says, this term sheet will have no binding effect on the parties, no binding effect, except that developers shall have the exclusive right to negotiate a definitive agreement with Wimata for a period of five months from the date of the term sheet. So it says except, so there clearly is a contract for something. It's a contract for an exclusive right to negotiate, and it's covered under applicable law by a duty of negotiating good faith. Correct. So you concede that, in fact, they did have a contract limited to that? We say that the term sheet had one thing in it that was binding, and that was that the parties negotiated with each other exclusively for a five-month period. And in good faith. And in good faith. Okay, so then the district court was just wrong because it said there's no contract here at all to enforce. So you're confessing error? No, I'm saying that Judge Collier did find that the parties had an obligation to negotiate with each other exclusively. She didn't say to the contrary. What she said is that the document did not go on to require that all the terms that were in the term sheet had to be part of the deal. Even the preamble to the term sheet says that it was a proposal being considered. So the analysis focuses on, as Your Honor asked the question, was that exclusivity obligation violated? And there is nothing in the allegations, as I read the amended complaint, and as you will or have read the amended complaint, that shows a violation. Again, it's not just exclusivity, it's also good faith negotiations during that period to reach the agreement, if possible. There's no right to have an ultimate agreement, but it is a right to have best efforts to reaching an agreement. And I think the complaint's filled with allegations. You may disagree, and I have no idea who's got the right side of the story. We don't decide that at this stage. But it's hard to say if this 100-something page complaint doesn't outline a lot of things that they say wasn't good faith. I respectfully disagree. I'm not disagreeing that there was an obligation of good faith inherent in a negotiation, exclusive negotiation that was imposed on WMATA and on the developer, which was extended generously. Well, but I think right there you're into one of the factual disputes. Was it extended generously, your view? Was it extended as part of this effort to keep changing the rules of the game and the terms of the contract because of interference by Mr. Graham? That's a fact dispute. We can't decide as a matter of law that it was a generously granted extension as opposed to a problematic stringing out of process, can we, as a matter of law? If you're looking at the allegations, the allegations are conclusory. All the allegations say is that this matter got before the board in March, almost two years after the process got started, and the board decided to table the agreement. Well, it doesn't really. I mean, to say this is conclusory, it's just a far cry from the kinds of conclusory allegations that the Supreme Court criticized in Twombly and Iqbal. I mean, they're getting into a lot of factual granularity here about what happened when and who was doing what and who said what to whom and how things changed and how they changed again. So I think you're going to have to try another tag on that one. Well, I will, respectfully. I think there was all kinds of allegations of collateral noise in this two-year process of Mr. Graham, allegations of Mr. Graham talking to the developer, another developer, allegations of the other developer making phone calls to the WMATA staff. But there were no allegations of bad faith. There were no allegations that, A, there was negotiation outside of the WMATA-Banneker context, and there were no allegations that the board did anything wrong in deciding to table this process after a two-year effort to make a deal. Let me just direct you on the exclusivity. I mean, I think that's a question where a pleader is going to at best have circumstantial information, circumstantial allegations. And it does seem like there is, I mean, there are allegations here from which one might infer that WMATA was, in fact, still talking with the other developer, was giving out information to them. I mean, the fact that they're asking for advice about, hey, can we get best and final offers from these other developers, it sounds like what they're saying is we've been chatting with them, we, in fact, have been negotiating with them. Can we move forward with what looks good out of those negotiations and get it formally before the WMATA board? Why isn't that a fair inference from the allegations of the complaint? Your question assumes that there were negotiations. There were, according to the allegations, discussions with an outside developer, and that outside developer was calling the staff and promoting itself and bad-mouthing the other developer. There's all kinds of allegations about that. But those types of discussions are not negotiations. The negotiations, and you have to look at the amended complaint, the negotiations continued exclusively. Those collateral outsides of the- Negotiations continued, but I guess characterizing communications, whether they rose to the level of interference with a duty to have good-faith negotiations, again, sounds to me like a factual characterization that's going to need development. Is it not? As a matter of law, we can say that those repeated communications and all the allegations about how they were instigated and what their consequences were, as a matter of law, we can't hold that those did not interfere with good-faith negotiations between WMATA and Banneker. Kelly thinks you can. Negotiation is a common-sense term of parties negotiating a contract and its specifics. To have other parties out there saying you should have chosen us, to have another developer saying the one that you chose is not a good developer, that's not a negotiation. Right, but the allegation isn't just that there were parties out there. There were parties getting the camel's nose into the- A party. Getting the camel's, well, in conjunction with another party, getting the camel's nose into the tent. And what was going on? Again, do you have a case that, as a matter of law, holds that negotiations have to interfere with a good-faith duty negotiation? The discussions with other people have to rise to a formal level of negotiation? I think our brief does address that. It addresses that these are not negotiations. These are conversations, outside conversations. Let me ask what just sort of on that same point. Best and final offer, meaning a best and final offer of what? Okay, so that allegation was a request that there maybe be put out to the public another opportunity for a best and final offer. That never happened. Right, I understand. That's a key thing. I understand that. I understand that. And there was, in fact, legal advice given that they couldn't do it. And they didn't do it. And, in fact, they extended the contract negotiations another three months. I've read the papers, but what I wonder is whether you can shed light on that. That's a best and final offer for the development project, not for a term sheet, but for the actual project, right? So they're saying we're working now under this term sheet to get a final development plan with Banneker. Best and final offer for what? Based on the allegations, I think you'd have to speculate as to what it was that the best and final offer was going to be for, maybe for other monetary propositions on how to handle this development. But a best and final offer to do this project, to build this structure. Yes, it was for the Florida Avenue site. Okay. And it was maybe to buy it, maybe to rent it. It was unclear. It just never happened. I understand that position. That's key. But it also creates an implication about what led up to that. Why were they even asking about that and assuming that anybody else was in a position to make a best and final offer? A lot of water under the bridge by that time, no? One might infer. That's key. That's key. There's a lot of water under the bridge. There's been almost two years of discussion, and this deal was still having difficulty coming together and having real traction where the parties were coming to specifics and moving it on to definitive agreements. It was long in the tooth. I think you would agree. Every deal has an hourglass with the sands dropping through it, and there was frustration, I'm sure. This one ran out. And no deal was done. They have a piece of public property that WMATA wanted to have developed at Florida Avenue, and they were still in discussions, frustrating discussions. So, yeah, maybe they thought about putting it out, but they never did. They adhered to the exclusivity and even extended it another three months from that point. Would you agree that the source of the difficulties you referenced that caused this ultimately to not go through, that you and the plaintiff have a different view of factually what the source of those difficulties were? You mentioned difficulties, but would you just agree that you have a different view of what caused the difficulties than they do? No, I think that we each... You all agree on the same story? No, yeah. I think that there's an agreement that there was a lot of discussion about a lot of issues in this whole complicated financial real estate transaction. Yeah. How about a little bit lower level of particularity? You don't agree with their statement? Do you dispute their statement of facts in their brief of how everything transpired? We accept their statement of facts and believe that the motion to dismiss was properly granted by Judge Collier. Okay. My time is up. Thank you. Good morning, Your Honors, and may it please the Court. My name is Daniel Golden. I'm Assistant General Counsel for the Council of the District of Columbia. I represent former D.C. Councilmember and former WMATA Board Member Jim Graham. With the Court's permission, I'd like to first address the issue of immunity and then spend a few minutes talking about the merits of the underlying tort claims. Turning to the issue of immunity, the first point I'd like to address is Banneker's allegation that Judge Collier erred in somehow shifting the burden of proof on this issue from Councilmember Graham to Banneker. Banneker's reliance on the Supreme Court's decision in Westfall v. Irwin on this point is misplaced. That case involved a motion for summary judgment where the defendant, who was also the movement, had the burden of demonstrating there was no genuine issue of material fact. This is a very different procedural posture, as Your Honors recognize. This is a 12D6 motion. And so Judge Collier corrects me. But don't you still have the burden? Didn't Mr. Graham still have the burden of proof? I mean, what that burden of proof was might be somewhat different, but you still had the burden of proof. Respectfully, the burden in the initial instance is on Banneker to have a well-pleaded complaint that includes allegations that, if true, would permit Banneker to circumvent the bar of absolute immunity. I'm sorry. You think the law is that they have to prove an absence of immunity at the 12B6 stage, that Mr. Graham didn't have to prove anything? I don't think anyone has to prove anything at the 12B6 stage, but at least the complaint needs to be ---- Somebody has a burden of proof. Correct. But I believe that that then comes out at the summary judgment stage, as it did. Is immunity an affirmative defense or is non-immunity an element of any of the torts or contract claims they made? Immunity is an affirmative defense, but it's a unique affirmative defense, Your Honor. And that's because it's not only immunity from liability, but it's also immunity from having to endure the process of ---- Absolutely. But I had always thought the burden of proof remained on the defendant at the 12B6 stage to make a showing that taking the facts in light most favorable to the plaintiff, there's immunity. Interesting. I've taken a look at this issue actually over the weekend, so this is not in our briefs, but there is a Second Circuit decision called Shmueli v. City of New York. Have you shared that decision with opposing clients now? I have not. I'm sorry, Your Honor, but I would, and that's my oversight. If it's helpful, then it might be good to send in a letter afterwards so that the other side can see it as well. Sure. But go ahead and talk about it. But it reconciles the fact that this is an affirmative defense, yet it's also appropriate for a court in a 12B6 motion to look solely at the allegations in the complaint and then determine whether immunity would in fact bar the plaintiff's cause of action. So we look at this on, I guess it's 12B1 or 12B6. This is actually 12B6. 12B1 applies to the sovereign immunity and the official capacity. That has not been appealed here. Okay. So we look at this on the 12B6 and we look at the plaintiff's allegations. And I think, as I understand it, the way the burden translates is that Mr. Graham has to raise his immunity defense and then be able to articulate in briefing why, given the allegations in the complaint, taking them in the light most favorable to the plaintiff, nonetheless, and therefore the plaintiff's complaint and characterizations that are reasonably in the plaintiff's favor govern, but nonetheless, on that universe of facts, that he's entitled to immunity. Is that how you understand it? That's correct, and we believe we've done that in our appellee's brief report. Well, can you address some of the questions that we were asking about the inside-outside of the outer perimeter of his duties and the questions about whether there are certain things that, even if they otherwise might be within his duties, might be done through means that are impermissible, for example, politically biased or corrupt means, and or the leaking? Sure. And I think I'd like to begin just by talking about what is in the cases that have been cited by Banneker. In those cases, McKinney v. Whitfield and Bishop v. Tice, those are cases where there were manifestly excessive means employed. Those cases were isolated instances of extreme physical coercion. In McKinney, for example, there was an actual battery on the plaintiff by the defendant. In Bishop v. Tice, there was a false imprisonment, a detention of the plaintiff. He was not allowed to contact a lawyer. He was threatened with false criminal charges. These kinds of situations would allow you to get around the immunity bar because they represent not only extreme instances of bright-line physical conduct, but also, you know, getting to the purposes of immunity, they wouldn't necessarily- Does your case suggest that physical impropriety is necessary as opposed to being sufficient? What I'm saying is you're telling me how this is different. What I'm trying to find out is does that difference make a difference? I don't think it's necessary to have physical coercion. In fact, I submit there could be a case where non-physical conduct is so extreme and, you know, and otherwise- Is the taking of a quid pro quo bribe sufficiently extreme to warrant the same treatment? Well, I think that conduct-just to address that briefly and then- I'm asking you to concede that's here, but if it were here, would that be sufficient? I think it's-you know, that kind of sensational conduct, I think, starts pushing against that boundary. But here, again, that conduct can be bracketed because that's something that happened before the term sheet. It allegedly happened before the term sheet, and it allegedly failed. Paragraph 8 of the complaint says this quid pro quo effort failed. If this were a case, you know, being brought by Mr. Williams or Mr. Payne, we might be having a different conversation. But Banneker was not injured in any way by the alleged quid pro quo. And so, therefore, it's not really falling within the purview of the immunity analysis at all. I think it's kind of a red herring. Is that right? Given that one of the reasons Wamata cites for why the contract never came through was a lack of a capital development partner, which, according to the allegations of the complaint, was a direct product of that criminal activity-allegedly criminal activity. Again, I think there are, you know, there's some problematic, you know, things in their complaint for those kinds of allegations. And specifically, I believe it's paragraph 136 of the complaint says, notwithstanding Graham's misconduct to cause it to be otherwise, Banneker at every step of the process put forth a development team with unquestioned capabilities and expertise. So even if this conduct were to have occurred, the things that are more sensational are in the complaint, they're sort of window dressing, and they don't really get to the substance of the issue. The question of whether they're causal sounds like a fact dispute to me. I'll bet you they'll say it. First of all, and I don't want to bleed over into the merits of the tort issues just yet, but I think those things are conceded as not causal in the complaint, and so they should be off the table. But in terms of immunity, I think I would just say, you know, what we're really looking at in terms of the conduct that we're asking for immunity for are things like, you know, expressing a preference for a lease versus a sale, seeking a reappraisal. Those things are harder. I think that's right. It's harder to overcome the immunity. But I think the concern is, and the reason why even the pre-term sheet conduct seems relevant, is at least the impression that the plaintiffs have is that there was a political favoritism motive behind a lot of what Graham was doing and that WMATA was sharing in that and allowing itself to be manipulated in that. And the legal question for us is, if that's the case, if that's adequately alleged, step one, we would have to determine based on allegations of the complaint, is that something that is excessive means such that it pops this out of the immunity, even though what he's doing is stuff that, had it been motivated in the, you know, impartial interests of the public, would have been within his job duties. And I know you point to these cases with sort of abhorrent physical conduct, but in politics, non-impartiality is the abhorrent, you know, verboten conduct. And so I guess I'm asking you why that isn't treated as excessive means. Sure. And I think the answer is because the intent of the defendant is irrelevant under this circuit's precedent with respect to whether immunity should be granted or withheld. That's in a case called Poole v. Gray. It says even if the defendant acted in bad faith, you know, that has no bearing on the immunity analysis. It's similar, although it was under D.C. law, a judge didn't tell your decision in Wilson v. Libby. I mean, that conduct was politically motivated and, you know, allegedly done for a bad purpose. However, we look at what are the individual's job responsibilities and have they manifestly exceeded the line of duty acted contrary to statutory authorization. I mean, it's a very, very high bar for the plaintiff to plead around, frankly. And we submit that that just did not occur here. If it's difficult to sort out which things are within the heartland to which immunity would apply, like we should have affordable housing and which things are out, like here's a piece of confidential information or a bigger story about this is all about the election campaign, war chest, what's the right course to do? Is it for us to sort this through? The district court was just sort of very categorical about this and didn't sort of look at the distinctions in these claims. Well, I mean, yes, I believe it's appropriate for disposition at this stage for the reasons I expressed. You know, again, I think I believe all the conduct, you know, as a matter of law, does not get you anywhere near McKinney or Bishop. And, you know, with that guidepost in mind, you know, what's alleged here is economic harm, and it's within the context. I mean, you can imagine the problems this would create for WMATA just administratively. You know, this is a two-and-a-half year's worth of conduct. There would have to be extensive discovery, numerous witnesses. This is not, you know, a man bites dog case like McKinney or Bishop versus Tice. This is a lot of conduct that would be extremely disruptive. And so I think that weighs into the analysis as well. I'm sorry, what weighs in? That it's a big case with a lot of discovery, that weighs into the immunity analysis? Yes, I believe so. Because, you know, under Westfall, you look at, you know, what are the administrative impediments that would be sort of created by denying immunity. Wouldn't that happen in every case? There would be discovery in every case, and it's always going to be claimed to be disruptive. But not every case involves a public entity doing the people's business. No, so about every case. But every case where sovereign immunity is going to involve public entities or public officials. Right. But I think also the conduct here is so sort of ambiguous that, again, it gets to this, you know, just exercising the amount of effort that would be necessary to delve into this, where it ends up ultimately being he said, she said. How are certain communications, you know, interpreted? I mean, really at the end of the day, the alleged actionable conduct here are, it's that Graham was talking to Banneker, that Graham was talking to third parties, and that he was talking to the staff. I mean, you referred to Bishop v. Tice as a case of sort of physical harm or physical coercion, but it's really a threat. It's a threat that's being used in a way to influence or to coerce. And here, at least the allegations have a lot of, you know, unless you do this, we're going to cut you out unless you do this. And so, I mean, the intent line, I don't know, it seems as implicated by maybe Bishop v. Tice as this case. Well, I think there's a couple things going on in Bishop v. Tice. And not only is it, you know, sort of the actual detention of the plaintiff, but it's also. But he wasn't detained, right? He was threatened. He was. He was put in a room and not allowed to leave for an hour, told he could not contact a lawyer and threatened with false criminal charges unless he resigned his job. And when you look at who the actors are in that case, too, it was two, I think it was OSHA regional auditors who do not presumably have personnel authority coming in and explaining to this plaintiff that he was going to have to leave his position. So those are the, I think, you know, those are the kinds of calls that I think courts can make at a motion to dismiss stage just to say, okay. What if instead of physical assault, they stole someone's wallet? That would be closer to getting around the immunity bar, I agree. Would it? So economic harm can in fact. Well, it's not only economic harm, but it's, you know, it's a direct misappropriation of property. And it's like Bishop and like McKinney, it's a discrete event. And it's also, you know, the conduct here is subject to interpretation because Graham as a, he was a WMATA board member, PDRE, Planning Development Real Estate Committee member. He had responsibility for doing oversight and as a WMATA board member for voting. And so he had to make an informed decision. He necessarily would be expected to be talking to some of the folks involved here. So I'm trying to figure out, is the manifest excessive, is it essentially a public policy limitation on the scope of immunity? Then sort of that's beyond the pale. Or is it something that's just so readily identifiable and discrete and has such harmful impact? I'm just trying to figure out from those cases what the rationale is for creating this spin back. Yeah, I'm sorry. The whole point of immunity is the assumption that someone did something, the assumption is you did something really bad. Right. But that's what we provide immunity for. And I'm not sure I have a bright line test. I think it is often context dependent. But I would just say, based on the precedents that we know of, that that context just is not present here. I would like to address the merits of the tort claims, actually, briefly, if that's all right with the court. Just briefly, yeah. Excuse me? Just briefly. Sure. On the intentional interference with the business expectancy, it's our position that as a matter of law, Banneker has failed to meet a business expectancy. Contrary to Banneker's claim, Judge Collier did not erroneously apply a per se rule that an interest in an expectancy that might involve government approval is always too remote. She actually said it ordinarily is. That's consistent with the … But then she didn't say much else. What's that? She didn't say much else. Well, but her decision was consistent with what's in National Railroad. Well, it's consistent in outcome, but not in articulation. There's a much more caveated articulation in National Railroad. It's going to be more difficult to show. That's true. That's very different than … That's true. Generally speaking, you get nothing. And National Railroad says, you know, yes, you do look at how discretionary is this decision. Here, the WMATA Board was vested with complete discretion. Do we just look at that? Do we look at practice? Do we look at the fact that at least, again, the allegation, maybe there's a factual dispute, is that two or three times here they came to final agreement on terms, and the Board, at least as a practical matter, almost never rejected that when that happened. Yet it seemed to keep happening repeatedly here while Jim Graham was heading the Board. Does that weigh in at all, or is it just as pure discretion so it can never … ? The language of the Joint Development Solicitation is so clear that, you know, it would be very dangerous to create tort liability in this context. I mean, the Joint Development Solicitation says as long as the security deposit is returned, which was the $100,000 that was given back in this case, WMATA may terminate the selected developer designation at any time. We have to read it. This is what struck me as a little odd. You have a good faith duty to negotiate based on terms. You know, the Stanford Hotel case. The expectation, at least, is that we picked you. We've agreed on these terms. We think if we work together, we'll be able to get to a contract. We'll be able to get to agreement. That's really what we think, and that's why we're just doing it with you, and that's why we charged you, by the way, $100,000 for this process. But there's no promises. Negotiations are tough, and these things are complicated. But we think there's an end point. And I don't understand what a good faith duty to negotiate in a world where there's no rules at all about an end point. Well, there were rules. I mean, there were rules here. It was a five-month. I mean, true, it was extended. But, I mean, what was clearly contemplated is you have five months to work out a deal. You're going to pay us $100,000, sure, but in the meantime we're going to put the property on ice and, you know, and we're going to exclusively negotiate with you. But you can't say as a matter of law, you have no expectation whatsoever you're ever going to get a contract and then marry that up and say, but by the way, the law does have a duty of good faith to negotiate to that, can you? I think you can because, you know, that's a separate cause of action, the duty to negotiate in good faith and fair dealing, and we're talking here about the existence of a separate business expectancy, which is a much, you know, that's a very difficult showing, as the court has indicated. So could they engage in good faith negotiations, spend a lot of time and effort, get right up to the last minute, everything's agreed upon, and then go, just kidding. So that would satisfy the duty of good faith negotiation. They did all the negotiation and then they go, but it's a government contract, so we get to say, just kidding at the end. I think in this case, though, you know, that is not. Can you do that? It seems to me that at least when you have a good faith duty to negotiate, there has to be some expectation that if the good faith process is pursued, I think that's what Stanford was saying, then there is some commitment to really try and have a contract at the end on behalf of the government, not a commitment. I'm a little hesitant to wade into this more ask, but I think that what you're talking about is like a type two agreement, which does contemplate, like, yes, unless both parties decide to walk away at the back end, we're going to have an agreement. This is very different. This is a term sheet just for an exclusive negotiating period. Stanford said something like this is a type two agreement. Yeah, and I'm saying I think this is something less than that. Whatever this thing is. Type three. Yeah, type three. Or 2B. I thought all we had to have was a good possibility of securing a contract. And Banneker's position in his complaint is they put up hoops, we jumped. We jumped, we jumped, we jumped. We were the one. I mean, we won the exclusive negotiating period. That gives us some expectancy. And then through that, we just did everything. We scurried, we jumped. We scurried, we jumped. And, you know, obviously in fact development, I could see that being defeated by all kinds of, you know, evidence. But on the complaint, no business expectancy that is reasonable. Right. But that's because of the language of the term sheet and the joint development solicitation. At will. Forget it. At will. Yeah, we're going to. I mean, all kinds of. You could be a contractor with the government and they could say, look, you know, build us a thousand desk chairs and they're going to have, you know, the D.C. logo on them and you go and you do it. And it's like, oh, actually, that was, you know, at will. We cancel. Really? Yeah, but, I mean, was that sort of baked in the cake from the beginning? I mean, did the person making the chairs know that that was, you know, a distinct possibility at the back end of the deal? You know, and there's a body of contract law that addresses that. I know it's probably a bad hypo because I doubt anybody would invest actual, you know, material in something if they didn't have some kind of clause. But, or, you know, training up for something because you're told, you know, you're through everything except for this level of clearance and it pretty much always works. I mean, isn't that what this tort is created for? I think this tort is created for situations that are ungoverned by contract. And that's what's unusual here is you have a term sheet that basically sets forth what the expectations should be. And so this is different from, you know, another case where everybody's kind of competing or there's no written signed understanding about how this whole thing is going to go forward. So I think this is a unique situation. Thank you very much. Oh, thank you. Mr. Grannis, you've used up all this time. Is that right? We'll give you a couple of minutes. Thank you, Your Honor. I won't trespass on the Court's indulgence. First, I want to make clear that we don't agree on why the deal fell through. You're quite right about that. Also, on page 27 of our reply, we actually talk about some of the manifestly excessive allegations that are in the complaint. There are, in fact, allegations that criminal statutes were violated in addition to the false criminal allegations. So I wanted to put that in. Before the term agreement? I'm sorry? Before the term agreement or after? Both. Spanning the entire thing. But I think the key there is, as some of the questions from the Court indicated, that the color that is placed on a lot of the Lucy pulling the football away stuff later on is often drawn from the earlier events that took place. The only other point that I have is that some of the earlier activity with the lottery and the donative campaign and taking away the capital development partners had, or your complaint, I guess, alleged that that is part of the story here. That's right. That's right. The other thing that I wanted to make sure I touched on was that there is a conspiracy allocation in the complaint, and I think it's important not to neglect that, not only for purposes of the interference thing, but also, I think, even for purposes of considering the immunity question. So the complaint alleges, paragraph 71, that Jim Graham and the LaCritz-Adler defendants all had an agreement to try and get LaCritz-Adler back into the deal, and that certainly would not be something that would be within Jim Graham's duties at WMATA. And you're not contesting Metro's sovereign immunity in this appeal? On the contract claims, there is no question of sovereign immunity. We understand there is a sovereign immunity hurdle to the fraud claim, which we also fled in the alternative. And the conspiracy? I'm sorry? And the conspiracy claim? I don't believe Metro is including the conspiracy claim, but if they are, then the sovereign immunity would apply there. And then as to LaCritz-Adler, what exactly did they do to interfere with the contract, according to the complaint? I suppose just make a couple calls to folks, which they probably have a right to petition their government for their interests. Well, if you're referring to the North Paddington defense, we don't believe that applies here. No, not North Paddington. I'm not getting the act doctrinal. But, you know, it can't be that a duty of exclusive good-faith negotiation means that you can't even take a call from another contractor. Right. No, but LaCritz-Adler was constantly calling every few months disparaging Banneker's bid, using confidential information on Banneker's bid in order to have those discussions, and was, in fact, offering. Do you allege that they knew it was confidential and they shouldn't be using it? That they knew, not that Jim Graham knew. Before I directly answer that question, I want to look at the complaint, but the allegations are at 261 and 262, and it's at least a very strong inference if it's not a direct allegation, Your Honor. As in many of these situations, it's the timing that's so suggestive. It's where, you know, Jim Graham has a lunch with Omar Kareem of Banneker and tells him something, and then Omar Kareem gets back from lunch and finds there's a phone call from LaCritz-Adler. You can trace the information flow, and when these things happen again and again, the inference is very strong that what's happening is Jim Graham and LaCritz-Adler are a team, and I think that that is relevant to evaluating Mr. Graham's immunity as well as to evaluating LaCritz-Adler's involvement in the interference. It may be that LaCritz-Adler, even if Mr. Graham is immune, winds up liable for what Mr. Graham did on their behalf in interfering with Banneker's contract. And does D.C. law make the leaking of information punishable by either a civil or criminal penalty, the type of leaking that occurred here? I don't know that offhand, Your Honor. Okay. Any other questions? Thank you very much. Thank you. Case is submitted.
judges: Millett, Pillard, Sentelle